**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| **ALLEN J., III,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:21-cv-386** |
| ) | |
| **KILOLO KIJAKAZI,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## REPORT AND RECOMMENDATION

Plaintiff Allen J., III, ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 8.

Presently before the Court are the parties' cross motions for summary judgment, ECF Nos. 10, 12. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 10, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 12, be

**GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for DIB on March 17, 2020, alleging disability due to congestive heart failure, hypertension, residual effects from a stroke in May 2019, chronic kidney disease, lumbar degenerative disc disease, numbness in both hands, and obstructive sleep apnea., with an alleged onset date of May 1, 2019. R. at 49–50.[1]  Plaintiff's application was initially denied on May 28, 2020.  Upon reconsideration, on September 29, 2020, Plaintiff was granted benefits with an alleged onset date of August 18, 2020, which is the day he began dialysis for chronic kidney disease. R. at 61–70, 104. On November 20, 2020, Plaintiff requested a hearing before an administrative law judge. R. at 109–11.

A hearing was held on March 29, 2021, at which Plaintiff's counsel appeared without Plaintiff before Administrative Law Judge Carol Matula ("the ALJ"). R. at 32–34. The only issue for consideration at the hearing was whether an earlier onset date of disability would be appropriate. R. at 34. Plaintiff's counsel amended Plaintiff's onset date to September 1, 2019. R. at 38–39. An impartial vocational expert testified at the hearing in response to hypothetical questions from the ALJ. R. at 41–47.

On April 8, 2021, the ALJ issued a decision finding Plaintiff was not disabled before August 18, 2020. R. at 15–25. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on May 14, 2021, making the ALJ's decision the final decision of the Commissioner. R. at 1, 7.

---

[1] "R." refers to the certified administrative record that was filed under seal on September 20, 2021. ECF No. 7, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

Having exhausted his administrative remedies, on July 14, 2021, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On October 15, 2021, Plaintiff filed a motion for summary judgment and accompanying memorandum in support. ECF No. 10–11. On November 3, 2021, the Commissioner filed a motion for summary judgment and brief in support. ECF No. 12–13. Plaintiff filed a reply on November 17, 2021. ECF No. 14. Because the motions are fully briefed, the matter is now ripe for recommended disposition.

## II. <u>RELEVANT FACTUAL BACKGROUND</u>

The record included the following factual background[2] for the ALJ to review:

The record shows treatments related to his alleged disabling impairments going back to June 2018. *See, e.g.*, R. at 741 (severe obstructive sleep apnea and sleep-related hypoxemia); R. at 729-30 (congestive heart failure, cardiomyopathy, chronic systolic heart failure, systolic murmur and malignant hypertension); R. at 389 (osteoarthritis of right shoulder AC joint); R. at 794-802 (cerebral white matter disease, possibly chronic ischemic"); R. at 387 (poor kidney functioning); R. at 369, 374 (wrist and hand pain); R. at 386 (left hip trochanteric bursitis); R. at 720 (issues pertaining to C5, T3, T10, and L5 vertebrae). Lastly, Plaintiff was diagnosed with stage 4 chronic kidney disease on May 3, 2019. R. at 379. His doctor suspected the cause of chronic kidney disease was hypertensive nephropathy. R. at 379.

In March 2019, before the amended alleged onset date of Plaintiff's disability, Plaintiff went to Sentara Norfolk General Hospital because he was experiencing facial droop, slurred speech, and right upper extremity weakness. R. at 513, 515. Plaintiff's diagnostic results

---

[2] The parties agree that the relevant period for the Court to consider is September 1, 2019 (Plaintiff's amended alleged onset date) through August 18, 2020, the date the Social Security Administration found him disabled. ECF No. 11 at 5. ECF No. 13 at 4, n.4. To give context to Plaintiff's longstanding impairments and diagnoses, both parties cited record evidence before September 1, 2019. Accordingly, the Court does the same here.

demonstrated "[m]oderately extensive cerebral white matter disease, most likely chronic ischemic" and no acute stroke was evident. R. at 519. His provider noted his progression of chronic kidney disease, but noted no acute need for dialysis. R. at 572. He also explained to Plaintiff the importance of renal outpatient follow up. R. at 572. Upon discharge, it was noted that Plaintiff experienced a possible transient ischemic attack (TIA).[3] R. at 422. Plaintiff returned to Sentara Norfolk General Hospital several days later reporting tingling in his scalp and eye twitching. R. at 507, 512. Plaintiff denied numbness or tingling in his extremities. R at 507. Plaintiff's neurological exam was "completely normal." His provider determined Plaintiff likely did not have a stroke, and he was discharged with instructions to follow up outpatient. R. at 507, 512.

With respect to his congestive heart failure, Plaintiff treated with Dr. Keith Newby at Fort Norfolk Plaza Cardiology. R. at 732. In April 2019, Dr. Newby noted Plaintiff's history with malignant hypertension as well as cardiomyopathy, in addition to congestive heart failure. R at 732. At that visit, Plaintiff had markedly elevated blood pressure, and a recent creatinine level of 2.1R. at 732. Plaintiff reported some intermittent chest discomfort and shortness of breath. R. at 732. Dr. Newby noted that Plaintiff had +1 lower extremity edema. R. at 733. His ejection fraction ("EF") was 35%, up 15% from his last echocardiogram. R. at 733. Plaintiff followed up with his primary care physician Dr. Michael Tucker, who noted that Plaintiff was "doing much better since discharge." R. at 396.

In April 2019, Plaintiff visited Dr. Douglas Trzcinski, of the Norfolk Hand Surgery Center complaining of sharp pain in his right wrist. R. at 369. Dr. Trzcinski noted Plaintiff had a right

---

[3] A transient ischemic attack, or TIA, is a temporary period of symptoms similar to those of a stroke. A TIA usually lasts only a few minutes and doesn't cause permanent damage. *Transient ischemic attack (TIA)*, The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679. "Often called a ministroke, a TIA may be a warning. About 1 in 3 people who has a TIA will eventually have a stroke, with about half occurring within a year after the TIA. A TIA can serve as both a warning of a future stroke and an opportunity to prevent it." *Id.*

wrist fusion around 1985, and that he was left-handed. R. at 369. Upon examination, Plaintiff had mild discomfort within the right wrist. R. at 369. Dr. Trzcinski noted that Plaintiff's right wrist had no swelling, edema, or warmth, and had normal strength and tone. R. at 370. His right hand had no tenderness to palpation, no pain, no instability or laxity, and normal sensation. R. at 370. An x-ray of Plaintiff's right wrist demonstrated evidence of partial wrist fusion with severe radiocarpal arthritis. R. at 369. Dr. Trzcinski discussed treatment options with Plaintiff, including steroid injections, splinting, and therapy, but Plaintiff declined, stating that his pain is fairly mild with his activities, and he would prefer to monitor for now. R. at 369.

As for his chronic kidney disease, Plaintiff treated with Dr. Hooman Sadr, a nephrologist with Tidewater Kidney Specialists. In May 2019, Dr. Sadr noted Plaintiff's diagnoses of stage four chronic kidney disease, stemming from hypertensive nephropathy, and complicated with hypertension. R. at 379. Dr. Sadr noted that Plaintiff's hypertension was generally uncontrolled, but had improved since he was at the hospital. R. at 379, 383. At that visit, Plaintiff's creatinine level was 2.29, and his physical exam was largely normal. R. at 381–82. Dr. Sadr found no need for a kidney biopsy. R. at 383. Plaintiff did not wish to make an advanced care plan, and was instructed to follow up in six months. R. at 383.

After Plaintiff's amended alleged onset date, he continued to treat with his providers and other providers for these conditions. In October 2019, Plaintiff presented at his chiropractor, David Milot, complaining of consistent sharp, aching, shooting, tingling, tightness, numbness and discomfort in his upper back, occasional aching, and discomfort in both his hands, intermittent tightness and aching discomfit in his low back, and tightness and discomfort in the back of his neck R. at 719. Upon evaluation, Dr. Milot determined that Plaintiff's "palpation reveal[ed] areas

of spasm, hypomobility and end punt tenderness indicative of subluxation at C5, T3, T10 and L5" and that his condition was worsening. R. at 720.

On November 21, 2019, Plaintiff followed up with Dr. Newby. Dr. Newby noted that Plaintiff had a history of hypertension, cardiomyopathy, and renal insufficiency, and that Plaintiff was not in full compliance with his treatment recommendations. R. at 735. Dr. Newby also noted Plaintiff's cardiac murmur, with an intensity grade II/CI. R. at 736. At this visit Plaintiff complained of "atypical type chest discomfort and shortness of breath periodically." R. at 735. Plaintiff reported to Dr. Newby that he did not experience such symptoms every day. R. at 735. Plaintiff also reported some atypical upper left chest pain and shoulder pain that seemed to be aggravated with movement of his left arm. R. at 735. Plaintiff had +1 edema in his lower extremities bilaterally. R. at 736.

Plaintiff also received an ECG/EKG that showed normal sinus rhythm, normal axis, left atrial enlargement, T-wave abnormalities. R. at 736. Dr. Newby noted that Plaintiff's EF was 40% which was up 15% from his last ECG/EKG. R. at 736. Dr. Newby noted that Plaintiff's malignant hypertension was 'worsening and no change at this time." R. at 736. Dr. Newby did report that Plaintiff's blood pressure readings were much better than previous and was not sure if that was due to a medical condition or a faulty medical device. R. 736. Plaintiff's last creatinine level increased to 2.1. R. at 736.

Dr. Newby referred Plaintiff to Virginia Neurology & Sleep Centers, P.C., and in December 2019, Dr. Barot diagnosed Plaintiff with severe sleep apnea and sleep-related hypoxemia. R. at 747–50. Plaintiff reported he was not using his CPAP/bilevel machine because he ran out of supplies, but admitted he did sleep and feel better when he did. R. at 747. Plaintiff

denied experiencing insomnia. R. at 747. Plaintiff agreed to use his machine once he received new supplies. R. at 747.

On December 2, 2019, Plaintiff followed up with Dr. Sadr. R. at 759. Upon examination, Plaintiff's cardiovascular, chest, and lung exam were normal. R. at 760. Plaintiff had no edema in his bilateral extremities. R. at 760. Plaintiff did not wish to make an advanced care plan. R. at 761. Dr. Sadr instructed Plaintiff to keep a log his blood pressure, to lose weight, and to reduce his intake of animal products and salt. R. at 761.

Also in December 2019, Plaintiff went to an urgent care facility complaining of pain in his neck and back, and numbness and tingling in his pinky and ringer finger of his right hand. R. at 765. His provider noted a marked decreased range of motion in Plaintiff's neck, but it was not tender. R. at 765. The provider also noted decreased sensation along the ulnar nerve of both hands, which was more on the right than the left. R. at 765. His strength was adequate, and no other abnormalities were noted. R. at 765. He was prescribed Tylenol, Robaxin, and prednisone. R. at 765. The following day, Plaintiff went to the hospital complaining of upper neck pain and chronic numbness and tingling in his hands. R. at 781–82. At the hospital, his examination showed some tingling in his hands bilaterally, but no evidence of weakness. R. at 782. Plaintiff's symptoms suggested cervical radiculopathy could be the cause. R. at 782. Upon examination, Plaintiff had five-out-of-five strength in his bilateral upper and lower extremities. R. at 783. A CT scan showed neuroforaminal narrowing consistent with Plaintiff's radicular symptoms. R. at 782. Plaintiff was advised to continue with previously provided pain medication, muscle relaxants, and steroids, and to follow up with a neurologist. R. at 782. Plaintiff followed up with Dr. Tucker who referred Plaintiff to an orthopedist. R. at 1071.

On December 16, 2019, Plaintiff saw Dr. Timothy Budorick at Atlantic Orthopedic Specialists regarding his neck pain and paresthesia in both of his upper extremities. R. at 763. According to Dr. Budorick, Plaintiff's neck motion had "60% flexion, 50% extension, and rotation is right and left about 50-60 percent" and "his pain and discomfort were minimal." R. at 763. As for sensory findings, Dr. Budorick noted Plaintiff had decreased sensation in his fingers, which was more pronounced in his right hand than left hand. R. at 763. Plaintiff's motor functions were intact to testing in the grip function, wrist extension, flexion, biceps, triceps, and deltoid. R. at 763. Dr. Budorick also reviewed Plaintiff's X-ray noting degenerative findings that are" more pronounced at C5-6 and C6-7," as well as his CT noting degenerative changes at multiple sites, and some facet arthropathy that is more apparent on the left at C2-3. R. at 764. Dr. Burdorick recommended physical therapy, prednisone, and for Plaintiff to see a neurologist. R. 764.

Plaintiff followed up with Dr. Tucker in February and March 2020, with continued complaints of pain in his hands. R. at 1070. Dr. Tucker recommended follow up with physical therapy and Dr. Budorick. R. at 1070.

On June 15, 2020, Plaintiff underwent an elective renal biopsy. R. at 1082, 2261–63. His baseline creatinine was 2.4. R. at 1082. Historically, his proteinuria was 1 to 2 g/day but had increased to 3.6 g, prompting the renal biopsy R. at 1082, 2268. Test results showed his eGFR was at 21.9. R. at 2270. His kidney biopsy demonstrated an eGFR of 21.9. R. at 2270. Plaintiff was diagnosed with hypertensive nephrosclerosis. R. at 1167. He was kept overnight and discharged on June 16, 2020. R. at 1081.

Several days later, Plaintiff returned to Dr. Tucker, where Plaintiff tested negative for edema but positive for pulses. R. at 1070. Dr. Tucker instructed Plaintiff to follow up in four months and to continue with medication and a strict diet. R. at 1069–70.

8

In July 2020, Plaintiff saw Dr. Sadr again and the doctor noted that his renal biopsy was consistent with hypertensive changes and that his renal functioning was in decline. R. at 1104. Plaintiff's physical exam was normal, and Dr. Sadr noted no edema in his bilateral upper extremities. R. at 1104. Dr. Sadr discussed different types of dialysis options with Plaintiff, including home, incenter, hemodialysis, and peritoneal dialysis. R. at 1104. Plaintiff stated he was going to think about his options and decide on AVF (arteriovenous fistula dialysis) versus waiting to start PD (peritoneal dialysis). R. at 1104. Dr. Sadr recommended kidney smart classes, and instructed Plaintiff to follow up in two months. R. at 1104.

At the end of July 2020, Plaintiff underwent an EMG nerve study found "bilateral median neuropathy at or distal to the wrists, moderate in degree electronically on the right and severe on the left, consistent with carpal tunnel syndrome. There is no evidence of a superimposed right cervical motor radiculopathy." R. at 1142.

On August 4, 2020, Plaintiff began a thirty-six-day hospitalization at Sentara Norfolk General Hospital. *See generally* R. at 1208–2577. Upon arrival, Plaintiff's chief complaint was abdominal pain, and he also experienced nausea and vomiting. R. at 2294. Plaintiff admitted he was drinking alcohol "too much because I have been staying home." R. at 2300. "It was noted that "[g]iven alcohol consumption history, significant pain, and significantly elevated lipase, acute pancreatitis [was] likely" and acute kidney injury was possible as Plaintiff's creatinine level was 3.0. R. at 2293. His progress notes on August 8, 2020, noted that his "baseline [creatinine] has lately been around 3's, currently 2.1, no indication for urgent dialysis currently." R. at 1261.

By August 10, 2020, Plaintiff's renal function was stable. R. at 1277. On both August 11, 2020, and August 17, 2020, Plaintiff's progress notes stated, "no indication for urgent dialysis " and "no immediate need to initiate dialysis" R. at 1289, 1376. On August 16, 2020, Dr. Sadr

9

noted that Plaintiff "previously attended kidney smart classes and was interest in [home dialysis]" but at that point, his creatinine was stable around 3. R. at 1364. Dr. Sadr noted that Plaintiff "seemed to be more open to the idea of starting dialysis" but there was no urgent need to start today. R. at 1364. On August 18, 2020, Plaintiff started dialysis. R. at 1403-04.

Plaintiff was fifty-four years old as of his amended alleged onset date. R. at 60. He has high school education, and past relevant work as a handyman/building repairer, pressure washer, pressure washer supervisor, and an administrative clerk. R. at 23–24.

### III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 404.1545(a). At step four, the ALJ considers whether the claimant can still perform past relevant work given his residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of September 1, 2019. R. at 17. At step two, the ALJ found that before August 18, 2020, Plaintiff had the following severe impairments: chronic severe cerebral white matter disease; status post congestive heart failure; general osteophytic changes L1-L5; hypertensive nephrosclerosis; chronic kidney disease stage 4; obesity (body mass index (BMI) in the low 30s). R. at 17. The ALJ found that Plaintiff's remaining medically determinable impairments were not severe, including: left trochanteric bursitis, osteoarthritis of the right AC joint, mild sigmoid diverticulosis, pancreatitis, bilateral carpal tunnel syndrome and neuropathy of the right radial nerve, degenerative changes of the cervical and thoracic spine, hip osteoarthritis, obstructive sleep apnea, hypertension, severe degenerative changes right wrist status post partial fusion, remote ischemic insult in the inferior right cerebellum, compromised vertebrobasilar circulation with proximal occlusion bilateral vertebral arteries and high-grade focal stenosis to the distal basilar trunk. R at 18. The ALJ concluded those impairments were not severe because they

11

did not exist for a continuous twelve-month period, were responsive to medication, did not require significant medical treatment, or did not result in continuous functional limitations. R. at 18.

At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 18–19. Among others, the ALJ considered Plaintiff's chronic kidney disease under Section 6.00 for Genitourinary Disorders. R. at 18. The ALJ concluded:

> Prior to August 18, 2020, the claimant was not on chronic hemodialysis or peritoneal dialysis (listing 6.03), and he did not have kidney transplant (listing 6.04). His impairments did not satisfy listing 6.05 because he did not have reduced glomerular filtration as described in 6.05A nor did he have renal osteodystrophy, peripheral neuropathy, fluid overload syndrome, or anorexia with weight loss, as described in 6.05B. He also did not have nephrotic syndrome as described in 6.06A-B, nor did he have complications of chronic kidney disease as described in listing 6.09 (6F, 16F-21F, 26F).

R. at 18–19.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with occasional stooping, kneeling, crouching, crawling, and climbing of ramps, stairs, ladders, ropes, or scaffolds. R. at 19.   In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." R. at 19.

At step four, the ALJ determined that Plaintiff was capable of performing his past relevant work as an administrative clerk, which is considered light work, because the physical and mental demands of this job does not exceed his RFC. R. at 23. At step five, the ALJ found that Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with

jobs existing in significant numbers in the national economy.  R. at 24.  Thus, the ALJ determined that Plaintiff was not disabled before August 28, 2020.  R. at 25.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion."  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Britt v. Saul*, No. 19-2177, 2021 WL 2181704, at *2 (4th Cir. May 28, 2021) (quoting *Craig*, 76 F.3d at 589).  The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions.  *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]."  *Craig*, 76 F.3d at 589.  If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)."  *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision.  *Hays*, 907 F.2d at 1456.

# V. **ANALYSIS**

Plaintiff's appeal to this Court raises two challenges to the ALJ's decision. Plaintiff alleges that the ALJ erred by: (1) failing to comply with the requirement of Listing 6.03 to consider an earlier disability onset date than August 18, 2020; and (2) failing to include additional limitations in Plaintiff's RFC based on his non-severe medically determinable impairments on the grounds that Plaintiff had no significant treatment during the relevant period. ECF No. 11 at 13–26.

## A. The ALJ Did Not Fail to Consider an Earlier Onset Date of Disability in Connection with her Evaluation of Listing 6.03.

Plaintiff first argues that the ALJ erred by failing to consider an earlier onset date of disability in connection with her step three analysis of Listing 6.03 . ECF No. 11 at 13. According to Plaintiff, he was found disabled by meeting Listing 6.03 as of August 18, 2020—the date he started kidney dialysis, but the ALJ was required to consider an earlier onset date pursuant to Section 6.00(C)(1)(b). ECF No. 11 at 13. Plaintiff contends that the ALJ did not explicitly or implicitly consider this requirement in her decision. *Id.* at 13. Plaintiff contends that the ALJ's failure to consider this requirement was not harmless error. *Id.*; ECF No. 14 at 2. In response, the Commissioner argues that the ALJ had no duty to explicitly refer to Section 6.00(C)(1)(b), or otherwise articulate the criteria in each listing. ECF No. 13 at 17–21. The Commissioner also argues that the ALJ's articulation was sufficient, and her conclusion at step three is supported by substantial evidence. *Id.* at 19–21.

At step three, the ALJ must determine whether the claimant's impairment meets or medically equals the severity of any disorder in the listings. § 404.1520(a)(4)(iii). "The 'listings' is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" *Bennett v. Sullivan*, 917 F.2d 157, 160 (4th Cir. 1990) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). A claimant will meet a listing if his or her impairment

14

"satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.*; § 404.1525(c)(3). A claimant will medically equal a listing if the impairment "is at least equal in severity and duration to the criteria of any listed impairment." *Id.*; § 404.1526(a). "When a claimant satisfies a listing by meeting all its specified medical criteria, he presumably qualifies for benefits." *Bennett*, 917 F.2d at 160. It is the Plaintiff's burden of production and proof that he or she meets or equals a listing. *See Pickett v. Astrue*, 895 F. Supp. 2d 720, 723 (E.D. Va. 2012) ("[t]hrough the fourth step, the burden of production and proof is on the claimant.") (citing *Hunter v. Sullivan*, 993 F.2d at 31, 35 (4th Cir. 1993)).

Pursuant to Listing 6.03, a person will satisfy the listing if he or she has chronic kidney disease with dialysis treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.03 ("Chronic kidney disease, with chronic hemodialysis or peritoneal dialysis"). The claimant's "ongoing dialysis must have lasted or be expected to last for a continuous period of at least 12 months," and the claimant must submit a report from an acceptable medical source describing the chronic kidney disease, current dialysis, and need for ongoing dialysis. § 6.00(C)(1)(a). Additionally, the regulations further provide that if a claimant is undergoing chronic dialysis, the chronic kidney disease "*may* meet [the] definition of disability before [the claimant] started dialysis." § 6.00(C)(1)(b) ("your [chronic kidney disease] *may* meet our definition of disability before you started dialysis. We will determine the onset of your disability based on the facts in your case record.").

Despite Plaintiff's contentions, there is no requirement in the regulation that the ALJ must specifically articulate whether he or she considered that the claimant "may" qualify as disabled before the start of dialysis. Plaintiff did not cite, and the Court was unable to find, any case law that the ALJ must explicitly articulate whether he or she considered that the Plaintiff *may* meet the Listing before dialysis depending on the facts in the record. Generally, the ALJ is "not required

15

to do a point-by-point breakdown of the listed impairment." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005). Thus, the ALJ did not inherently err by failing to specifically state that she considered whether Plaintiff met the Listing before he started dialysis.

Moreover, here, the ALJ's decision demonstrates that she sufficiently considered the facts in the record to determine if Plaintiff's disability "may" meet the disability definition in accordance with Listing 6.03 before he started dialysis. *See Keene*, 732 F. App'x at 177 ("an ALJ's step-three conclusion that the claimant did not meet the listing at issue can be upheld based on the ALJ's findings at subsequent steps in the analysis"). At step three, the ALJ found that Plaintiff did not meet Listing 6.03 because he was not on dialysis. R. at 18. When determining Plaintiff's RFC, the ALJ thoroughly detailed Plaintiff's medical records throughout the relevant period. R. at 20. The ALJ noted that Plaintiff was ultimately awarded benefits with an onset date of August 18, 2020, due to satisfying the criteria of Listing 6.03. R. at 20. She then noted Plaintiff "alleges he was disabled before that date" and that in arguing disability before that date, Plaintiff's representative "pointed out that the claimant was hospitalized beginning August 4, 2020, before he started dialysis, and that the claimant's nephrologist began discussing dialysis in July 2020." R. at 20. The ALJ then stated, "the record as a whole, however, indicates that the claimant had the physical capability to perform light work with occasional stooping, kneeling, crouching, crawling, and climbing before August 18, 2020." R. at 20.

The ALJ specifically considered Plaintiff's "main issues"—"hypertensive nephropathy with chronic kidney disease, stage 4 and hypertensive nephrosclerosis per renal biopsy." R. at 22. In doing so, the ALJ thoroughly detailed Plaintiff's history with kidney disease throughout the relevant period. The ALJ explained that in 2017, Plaintiff's baseline creatinine level was 2.2-2.5,

16

and by June 2020, his creatinine level was 2.4. R. at 22 (citing R. at 455). The ALJ found that despite the severity of his kidney disease, the record did not document significant symptoms. R. at 22. As of 2019, Plaintiff was only following up with his kidney specialist every six months, and his exams were largely normal aside from elevated blood pressure and BMI. R. at 22. The ALJ then noted that Plaintiff's issues began to exacerbate in June/July 2020, when it was noted that he had nephrotic syndrome with nephrotic range proteinuria. R. at 22 (citing R. at 1082, 1087, 1107–1202). Nonetheless, he had a generally unremarkable exam in June 2020. R. at 22 (citing R. at 1091). The ALJ noted that Plaintiff's doctor discussed options for renal replacement therapy in July 2020, but no plans were made, and Plaintiff was instructed to follow up in two months. R. at 22 (citing R. at 1074).

The ALJ explained that Plaintiff's kidney disease "did not significantly worsen until August 2020" when he was hospitalized for acute kidney injury due to pancreatitis. R. at 22 (citing 1208–2240). Nonetheless, even then, Plaintiff's creatinine was sill 3.0 and Plaintiff was not experiencing any cough, shortness of breath, chest pain, leg swelling, dysuria, hematuria, back pain, weakness, lightheadedness, numbness, headaches, or edema. R. at 22 (citing R. at 1216, 1219). The ALJ explained that on August 15, 2020, Plaintiff still denied most eremic symptoms except hiccups. R. at 22 (citing R. at 1355). Plaintiff attended kidney smart classes, and expressed interest in home dialysis, and his creatinine level was stable around 3. R. at 22 (citing R. at 1364). The ALJ noted that even the day before Plaintiff's established onset date, "there was no immediate need to start dialysis as the claimant had acceptable electrolytes and was self-diuresing well." R. at 22 (citing R. at 1376).

Plaintiff points to the ALJ's lack of discussion of two specific medical records. ECF No. 11 at 14. The first, Plaintiff's kidney biopsy on June 16, 2020, revealing an eGFR score of 21.9,

and the second, Dr. Sadr's recommendation that Plaintiff begin kidney dialysis with AVF port placement on July 1, 2020. *Id.* (citing R. at 2270, 1104). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curium)). But more so, Plaintiff is incorrect because the ALJ specifically considered the evidence Plaintiff cites, even if she did not specifically mention the eGFR score. R. at 22. The ALJ cited Exhibit 20F/6 (R. at 1074), which is a duplicate of the record Plaintiff cites—R. at 1104. That exhibit reflects Dr. Sadr's notes that Plaintiff's biopsy was consistent with hypertension, and that he discussed dialysis options with Plaintiff. R. at 1074, 1104. The ALJ used this exhibit to support the notion that Plaintiff's doctor discussed options for renal replacement therapy in July 2020, but Plaintiff was instructed to follow up in two months. R. at 22; R. at 1074, 1104. Thus, the ALJ clearly considered the evidence Plaintiff cites.

Given the ALJ's extensive analysis, it is evident that the ALJ considered an earlier onset date, and used the record evidence to justify her finding that an earlier onset date was not warranted. Accordingly, the ALJ did not err in her consideration of Listing 6.03 by failing to consider and find an earlier onset date, and substantial evidence supports this decision.

**B. The ALJ Did Not Err in Her Consideration of Plaintiff's Non-Severe Medically Determinable Impairments.**

Plaintiff argues that the ALJ incorrectly found that during the relevant period, Plaintiff had "no significant treatment" for his other medically determinable impairments, including his status-post stroke, severe carpal tunnel syndrome, right wrist and hand pain, neck pain, cervical radiculopathy pain, lower back pain, and lower extremity edema. ECF No. 11 at 15. Plaintiff argues that those impairments should have resulted in additional limitations to Plaintiff's RFC. *Id.* In response, the Commissioner argues that Plaintiff misstates the ALJ's decision and does not

consider the ALJ's fulsome discussion about the conditions Plaintiff identifies. ECF No. 13 at 22. Plaintiff's argument is without merit.

First, the ALJ did not find that Plaintiff had no significant treatment for each medically determinable impairment that Plaintiff identified. In evaluating Plaintiff's RFC, the ALJ discussed Plaintiff's "history of problems with his wrists and hands, including a partial fusion of his right wrist in the 1980s, severe end-stage arthritis in his right wrist, moderate carpal tunnel syndrome in the right wrist, right sensory radial neuropathy, and severe left carpal tunnel during the relevant time period." R. at 21. The ALJ then stated that "[c]laimant, however, had no significant treatment for these issues during the relevant time period." R. at 21. Thus, the ALJ's statement regarding "no significant treatment" was only related to Plaintiff's "problems with his wrists and hands." R. at 21. Furthermore, Plaintiff conflates insignificant treatment with insignificant medical evidence. ECF No. 11 at 15. Plaintiff states twice that the ALJ "refer[red] to certain medical evidence as insignificant." ECF No. 11 at 15. However, the ALJ did not refer to *medical evidence* as insignificant—rather, he noted that Plaintiff did not have *significant treatment* for those issues. R. at 21. In fact, the ALJ recognized that the evidence was significant—he referenced "the severity of the carpal tunnel syndrome" in Plaintiff's left wrist—he merely found that Plaintiff did not have significant treatment for that impairment. R. at 21.

Second, the ALJ did not err in finding that Plaintiff had no significant treatment for his problems with his wrists and hands. Plaintiff points to a number of medical records indicating the severity of Plaintiff's problems with his wrists and hands, including EMG results demonstrating severe carpal tunnel syndrome in the left wrist, and moderate carpal tunnel syndrome in his right wrist. ECF No. 11 at 15. However, Plaintiff points to no evidence of *treatment* that he received

because of those impairments. Thus, the ALJ did not err by finding that Plaintiff had no significant treatment for the issues with his wrists and hands.

Third, substantial evidence supports the ALJ's finding that no additional RFC limitations were warranted based on the impairments Plaintiff identified. While an ALJ must consider a claimant's non-severe impairments, "there is no requirement that the RFC reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Dejuna N. A. v. Saul*, No. 3:19cv874, 2021 WL 1015840, at *8 (E.D. Va. Feb. 16, 2021), *report and recommendation adopted*, 2021 WL 982632 (E.D. Va. Mar. 16, 2021) (quoting *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D.W. Va. Mar. 28, 2016)). Additionally, diagnoses, alone, are insufficient to establish disability—"[t]here must be a showing of related functional loss." *Parsons v. Berryhill*, No. 3:18cv1107, 2019 WL 2252023, at *11 (S.D.W. Va. May 2, 2019) (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)), *report and recommendation adopted*, 2019 WL 2256395 (S.D.W. Va. May 24, 2019). Thus, a claimant must demonstrate "how that condition results in actual functional limitation." *Id.*

With respect to Plaintiff's wrist and hand problems, the ALJ explained that although Plaintiff had a history of partial fusion of his right wrist in the 1980s, severe end-stage arthritis in his right wrist, moderate carpal tunnel syndrome in the right wrist, right sensory radial neuropathy, and severe left carpal tunnel, he did not receive significant treatment for those diagnoses. R. at 21, The ALJ explained that in April 2019, Plaintiff reported only mild discomfort within the wrist and no swelling. R. at 21 (citing R. at 368–73). Upon exam, Plaintiff had normal grip strength, and sensation, and no instability or laxity. R. at 21. Plaintiff reported his pain was mild with activities and he preferred to monitor the condition. R. at 22. Importantly, Plaintiff reported he was able to

use his hands for cooking, driving, and dishes, and while he had some numbness while caring for his personal needs, he did not need assistance with bathing and dressing. R. at 22. The ALJ concluded that based on these findings, Plaintiff did not have significant manipulative limitations that would warrant an RFC limitation. Plaintiff does not point to evidence that the ALJ did not consider that would warrant additional functional limitations, or what functional limitations should have been included in Plaintiff's RFC. Accordingly, substantial evidence supports the ALJ's conclusion that additional limitations resulting from Plaintiff's wrist and hand problems were not warranted.

As for his neck pain, cervical radiculopathy pain, and lower back pain, the ALJ thoroughly reviewed Plaintiff's "history of spinal issues, including issues in his thoracic, lumbar, and cervical spine." R. at 21. The ALJ noted that Plaintiff had degenerative changes in his thoracic and cervical spine, and general osteophytic changes in his lumbar spine. R. at 21 (citing R. at 427, 2509, 897–89). The ALJ noted that Plaintiff only had "limited conservative treatment" for these issues, including chiropractic care and medication. R. at 21. The ALJ explained that although Plaintiff noted some diminished sensation, his pain and discomfort was minimal. R. at 21 (citing R. at 763–76). The ALJ concluded that Plaintiff's "imaging studies, course of treatment, and physical exams suggest he could perform light work even with his spinal issues." R. at 21. The ALJ further bolstered this conclusion by noting that Plaintiff takes his children to and from school, washes clothes once a week, does dishes, irons, shops in stores, and goes to church. R. at 21 (citing R. at 225–32). The ALJ cited substantial evidence to support her conclusion that additional limitations resulting from Plaintiff's spinal issues were not warranted.

Turning to the remaining impairments Plaintiff identified—status-post stroke, and lower extremity edema—Plaintiff again points to these diagnoses, but does not explain how they result

21

in functional limitations that warrant additional limitations in Plaintiff's RFC. *See* ECF No. 11 at

15. As noted by the Commissioner, Plaintiff did not present an argument why Plaintiff's status-

post stroke would result in additional limitations. ECF No. 13 at 24 & n. 12. Nonetheless, the

ALJ clearly considered Plaintiff's history of possible TIA. R. at 21. The ALJ explained that

Plaintiff had a possible TIA in March 2019, and that imaging showed "a probable remote ischemic

insult in the inferior right cerebellum" and "advanced cerebral white matter disease." R. at 21

(citing R. at 425, 427). By December 2019, a CT showed no acute findings or significant interval

change. R. at 21 (citing R. at 900). The ALJ found that "[t]he record does not show significant

complications from white matter disease such as cognitive difficulties or difficulties with

ambulation and balance." R. at 21. The ALJ then concluded that it appears Plaintiff "could

perform the exertional requirements of light work, unlimited balancing, and occasional other

postural activities." R. at 21. Given the ALJ's analysis, there is substantial evidence to support

the ALJ's conclusion that additional limitations would not be required to account for Plaintiff's

status-post stroke.

With respect to lower extremity edema, the ALJ did not identify edema as a medically

determinable impairment. R. at 18. Nonetheless, the ALJ noted Plaintiff had a history of edema

in conjunction with congestive heart failure with cardiomyopathy and hypertension. R. at 20

(citing R. at 729–37). However, when he arrived at the hospital in early 2020, Plaintiff had no

lower leg edema. R. at 22. Plaintiff does not point to any evidence that Plaintiff's lower extremity

edema would cause him functional limitations that would warrant additional RFC limitations.

In sum, the ALJ did not err by finding the impairments identified by Plaintiff did not result

in additional functional limitations. In so finding, the Court reiterates that it cannot "reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

ALJ." *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020) (quotation and citation omitted). If "conflicting evidence allow[ed] reasonable minds to differ" then "we defer to the ALJ's decision." The ALJ applied the correct legal standards and substantial evidence supports her conclusions, and thus, remand is not warranted.

## VI. RECOMMENDATION

Because the ALJ applied the correct legal standards and substantial evidence supports the ALJ's decision, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 10, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 12, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985);

23

*Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
August 19, 2022